# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| | § | |
| | § | |
| BOND PHARMACY, INC. d/b/a AIS HEALTHCARE, | § | Civil Action No. 1:23-cv-53 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BLUE CROSS BLUE SHIELD OF WYOMING, | § | |
| | § | EXPERT REPORT OF |
| | § | PETER DRESSEL |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## I.  QUALIFICATIONS

1.      I am a Senior Managing Director in the Healthcare Risk Management and Advisory Practice of FTI Consulting, Inc. ("FTI"), a global financial advisory and consulting firm.  I am based in Washington, DC.  Throughout my career I have assisted hospital systems, inpatient rehabilitation facilities, skilled nursing facilities, home health organizations, hospice providers, durable medical equipment suppliers, pharmaceutical companies, device manufacturers, dialysis providers, infusion providers, and others in the healthcare industry.  I have worked in the healthcare industry my entire career and my work has focused primarily on (a) providing consulting to healthcare organizations related to operational, financial, and compliance issues; and (b) conducting investigations of compliance and legal issues in the healthcare industry.

2.      As a consultant, I have significant experience analyzing data to identify compliance and operational trends, issues, and areas for further analysis; designing and conducting audits and reviews to identify possible internal control weaknesses and risks; evaluating internal control and incentive structures to assess their impact on compliance matters; and identifying and implementing opportunities for improvement. My work routinely includes sampling and extrapolating the results of samples to the populations from which the samples were taken.

3.      I also work extensively with healthcare organizations and their counsel to address a wide range of matters involving potential financial and legal exposure.  These matters have involved audit and administrative adjustments; legal claims for recoupment of amounts paid; post-acquisition disputes; and alleged violations of applicable Federal and state laws.  A significant number of these matters relate to Medicare and Medicaid billing and reimbursement and, accordingly, have included numerous presentations to regulatory authorities and oversight organizations including, for example, representatives of the Department of Health and Human Services and the Department of Justice.

4.      I graduated from the University of Virginia with a Bachelor of Arts degree in Economics with a concentration in Finance and later received a Master of Business Administration degree from the George Washington University with a concentration in Accounting.  I am also a member of the Health Care Compliance Association ("HCCA"), Healthcare Financial Management Association ("HFMA"), and the American Health Lawyers Association ("AHLA").

5.      My resume, which includes a list of all publications I have authored and all cases in which I have testified as an expert at trial or by deposition within the past four years is attached as Exhibit 1 to this report.

6.      FTI is being paid hourly rates for my services in this case.  Throughout this report I sometimes refer to work performed by other FTI staff members acting under my direction as having been performed by me. Regardless, all the opinions and conclusions reached in this report are my opinions and are based on my review of the materials related to this matter and my professional experience. Compensation for FTI's services is not dependent on the outcome of this matter.

## II.    DESCRIPTION OF ENGAGEMENT

### A.    Scope of Work

7.    I have been engaged by Counsel for Bond Pharmacy (herein referred to as "AIS Healthcare" or "AIS") to provide expert opinions regarding the payment of Home Infusion Therapy ("HIT") services.  I have been asked to review documents and analyze data produced in this matter to provide expert analysis on damages; including specifically, to calculate the difference between what AIS was paid and what it was owed based on rates with Blue Cross Blue Shield of Wyoming (herein referred to as "BCBSWY" or "Defendant").  I am also prepared to respond, as appropriate, to any additional allegations or propositions that may be put forth by Defendants via expert reports submitted on their behalf or through other means.  This report sets forth my opinions as of July 12, 2024.

8.    My opinions and conclusions are based on documents and data produced in this matter; publicly available information; as well as my experience conducting and leading healthcare billing and coding claim reviews.

### B.    Materials Considered

9.    A list of the materials considered preparing this report is attached as Exhibit 2 to this report.

## III.    BACKGROUND

10.    This matter involves HIT services rendered by AIS to beneficiaries (herein referred to as "members" or "patients") of BCBSWY in connection with a BCBSWY Participating Provider Agreement (the "Agreement") between AIS and BCBSWY.[1]  AIS provides a specialized HIT service where compounded medications are infused, or "administered," to a patient through an implantable intrathecal pain pump.  Intrathecal pain pumps administer small amounts of pain medication directly to the spinal cord which can minimize the side effects often experienced with larger oral doses of the same medications.[2]

11.    There are three types of HIT services at dispute in this matter.  First are those associated with healthcare billing code S9328, which represents "*Home infusion therapy, implanted pump pain management infusion; administrative services, professional pharmacy services, care coordination, and all necessary supplies and equipment (drugs and nursing visits coded separately), per diem.*"[3]  The second HIT service at issue are drugs (e.g., fentanyl, morphine, bupivacaine) that are part of a compounded solution which, via the intrathecal pain pump, are infused, or administered, to a patient's spine.  The third HIT service at issue are miscellaneous services provided to patients which do not fit in the first two categories – these are herein described

---

[1] *See:*  Participating Provider Agreement.
[2] *See:*  https://www.upmc.com/services/neurosurgery/spine/treatment/pain-management/intrathecal-pump.
[3] *See:*  Healthcare Common Procedure Coding System ("HCPCS") published by The Centers for Medicare & Medicaid Services ("CMS"); AISWY00001244.

3

as "Other."  BCBSWY has denied claims for payment, or demanded recoupment for payments already made, for the HIT services at issue in this matter.[4]

12.     Healthcare insurance billing is primarily a function of various codes as opposed to detailed narratives of procedures or items performed.  Uniform code set standards were mandated by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[5]  The code sets established under HIPAA streamline and standardize the electronic exchange of healthcare data among covered entities (i.e., health plans, healthcare clearinghouses, and healthcare providers).  The types of codes at issue in this matter fall under two specific categories:

a.     Healthcare Common Procedure Coding System ("HCPCS") codes:  HCPCS codes are based on CPT codes.  HCPCS was established in 1978 to provide a standardized coding system for describing specific items and services.[6]  HCPCS includes two separate levels of codes[7]:

i.     Level I codes consist of Current Procedural Terminology® ("CPT®") codes.  CPT® codes are used by healthcare providers to describe medical, surgical, and diagnostic services and are designed to communicate uniform information about medical services and procedures among healthcare providers, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes.[8]  CPT® codes are developed and updated by the American Medical Association ("AMA").[9]

ii.     Level II codes are the HCPCS alphanumeric code set and primarily include non-physician products, supplies, and procedures not included in CPT®.  These codes and their descriptors are approved and maintained jointly by an alpha-numeric editorial panel consisting of the Centers for Medicare and Medicaid Services ("CMS");[10] in conjunction with America's Health Insurance Plans ("AHIP"), and Blue Cross and Blue Shield Association ("BCBS").[11]

---

[4] *See:* DEFENDANT'S ANSWER AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL.
[5] *See*: 74 FR 3328
[6] *See:* "NEW CMS CODING CHANGES WILL HELP BENEFICIARIES" - https://www.cms.gov/Medicare/Coding/ MedHCPCSGenInfo/Downloads/HCPCSReform.pdf
[7] *See:* "Healthcare Common Procedure Coding System" from https://www.cms.gov/medicare/coding-billing/healthcare-common-procedure-system.
[8] *See:* Current Procedural Terminology ("CPT") Manual, Professional Edition, published by the American Medical Association ("AMA").
[9] *See:* Current Procedural Terminology ("CPT") Manual, Professional Edition, published by the American Medical Association ("AMA").
[10] *See:* "*CMS maintains HCPCS Level II codes, including decisions about additions, revisions, and deletions to the codes.*" from https://www.cms.gov/medicare/coding-billing/healthcare-common-procedure-system?redirect=/medhcpcsgeninfo -
[11] *See:* https://hcpcs.codes/.

      b.    National Drug Codes ("NDC"):  An NDC is a unique product identifier for drugs intended for human use in the United States.[12]

13.     This dispute primarily involves HCPCS Level II codes; which were originally created for use by government insurers including Medicare[13], and NDCs; which are a unique product identifier used in the United States for drugs intended for human use[14]. The United States Department of Health and Human Services ("HHS") published a final rule on August 17, 2000[15] in which it adopted HCPCS Level II codes and NDCs as the standard code set to be used by all payers for use in HIPAA[16].  CMS maintains HCPCS Level II codes and is responsible for making decisions about additions, revisions, and discontinuations of codes while the U.S. Food and Drug Administration does the same for NDCs.[17]  Accordingly, HCPCS Level II and NDCs are standard code sets designated for use by all payors.[18]

14.     The final rule implementing the use of standard code sets under HIPAA[19] stated that the use of standard code sets was to "*...improve the Medicare and Medicaid programs and other Federal health programs and private health programs, and the effectiveness and efficiency of the health care industry in general, by simplifying the administration of the system and enabling the efficient electronic transmission of certain health information.*"  The final rule also states that "*When the HIPAA code set standards become effective, these health plans will have to receive and process all standard codes, without regard to local policies regarding reimbursement for certain conditions or procedures, coverage policies, or need for certain types of information that are part of a standard transaction.*"[20]  In other words, adherence to the standardized code sets under HIPAA means that health plans must handle the codes uniformly and cannot apply local variations or exceptions based on their own policies or preferences.  This ensures consistency and interoperability in healthcare transactions across different entities and systems which, in turn, enables the efficient transmission of health information across the healthcare industry.  Accordingly, the codes relevant to this litigation – particularly S9328 – have standardized definitions as part of the broader standard code system and are not subject to change by any individual health plan.  BCBSWY echoes this concept and promotes its compliance with HIPAA and its implementation related of policies and procedures; including those with respect to standard code sets.  Specifically, as indicated on www.bcbswy.com; BCBSWY states "*Blue Cross Blue Shield of Wyoming (BCBSWY) is complying with each of the HIPAA regulation standards by their respective mandated implementation dates.  BCBSWY has implemented the standard transactions*

---

[12] **See:**  21 CFR 207.33; an NDC is a unique, 3-segment numeric identifier assigned to each medication listed under Section 510 of the U.S. Federal Food, Drug and Cosmetic Act.
[13] **See**:  87 FR 69404 at 70024
[14] See:  21 U.S. Code § 360 - Registration of producers of drugs or devices
[15] **See:**  65 FR 50312
[16] **See**:  45 CFR 162.1002
[17] **See**:  65 FR 50312
[18] **See**:  87 FR 70024
[19] 65 FR 50312
[20] 65 FR 50361

*and **code sets regulations** and has implemented policies and procedures to adhere to the privacy regulations.[21]"* (emphasis added)

15.      Home infusion pharmacy providers such as AIS maintain standard billing rates for services, represented by the types of codes described above.  The standard bill rate (also referred to as a charge) typically is not the amount that payors (whether government or private) will reimburse.  Instead, payments are typically based on agreements with third-party payors (such as BCBSWY) under which healthcare providers are paid based on a variety of potential methodologies, such as, the cost of providing services, predetermined rates per diagnosis, fixed per diem rates, and/or discounts from gross charges.  For example, in this matter, AIS's standard bill rate for per diem services billed under S9328 was ▮▮▮▮ per day despite the fact that the agreed upon **payment** rate with BCBSWY was approximately ▮▮▮[22]  This concept is relevant to the distinction between the manner in which sampling was performed in this litigation (which relied in part on **billed** rates) versus any potential future calculations estimating how much AIS was underpaid (which rely on **payment** rates).

## IV.   SUMMARY OF OPINIONS

16.      Based on the work I have performed to date, and as further detailed below, I have developed the analyses and formed the opinions described in this report to a reasonable degree of professional certainty.

   a.   Opinion 1:  AIS provides HIT services and drugs that are properly billed under the National Home Infusion Association ("NHIA") Standards definition of a per diem.

   b.   Opinion 2:  Documents produced in this matter for the 302 sampled claim lines (202 AIS and 100 BCBSWY) confirm that AIS provided drugs and services that met the NHIA Standards and BCBSWY guidance described.

   c.   Opinion 3:  AIS was underpaid by $▮▮▮▮ across the claim lines subject to sampling in the AIS's Sample.

## V.   BASIS FOR OPINIONS

### A.   *Opinion 1:  AIS provides HIT services and drugs that are properly billed under the NHIA Standards definition of a per diem.*

17.      I regularly supervise professional medical coders and clinical reviewers in performing reviews and audits of healthcare provider claims activity.  This involves beginning every review by identifying the applicable standards and guidance relevant to the claims for payment being reviewed.  In the context of claims billed to the Medicare program, for example,

---

[21] ***See***:  https://www.bcbswy.com/information/#:~:text=Blue%20Cross%20Blue%20Shield%20of%20Wyoming%20(BCBSWY)%20is%20complying%20with,adhere%20to%20the%20privacy%20regulations.
[22] This rate is discussed in more detail below at footnote 61.

6

my teams and I would refer to materials such as the Medicare Benefit Policy Manual[23], the Code of Federal Regulations, and relevant CMS or other governmental publications and policies to determine the guidelines applicable to the codes billed on those claims.

18.     As discussed above, this matter involves the billing of HCPCS Level II code S9328 as well as drugs billed under NDCs and J-Codes.[24]  In my experience, the first step in conducting a review or audit is to review the payor and industry guidance for the relevant billing guidelines. In this case, the Agreement between the parties stated that the responsibilities of the Provider included "*Comply[ing] with all applicable federal and state laws, all applicable professional standards and provider Covered Services in accordance with practices and standards prevailing in Provider's medical community at the time of treatment and in conformity with BCBSW''s Medical Management Program.*"[25] In my experience,  the operative guidance for home infusion billing procedures are published by the NHIA (herein referred to as the "NHIA Standards").[26]  The NHIA Standards address concepts directly related to the HCPCS Level II descriptor for S9328 and drugs billed under NDCs and J-Codes [27]; specifically:

  a.     Definition of the term "per diem";

  b.     Selection of the correct per diem code;

  c.     Products and services included in the definition of the per diem;

  d.     Manner in which drugs are billed; and

  e.     Services excluded from the per diem.

19.     NHIA Standards define the term "per diem" as representing "*each day that a given patient is provided access to a prescribed therapy, beginning with the day the therapy is initiated and ending with the day the therapy is permanently discontinued.*"[28]  "Permanently" is also a defined term in an episodic sense – that is, the continuation of therapy is not anticipated beyond the day that therapy is discontinued.[29]  The NHIA Standards are echoed, nearly verbatim, in an excerpt from what appears to be a BCBSWY "*Home Infusion Provider Manual.*"  The manual provides guidance on Home Infusion Reimbursement and states "*The per diem is billed for each day that a patient is on service from date of admission through date of discharge.*"[30]

20.     The NHIA Standards go on to state that a patient does not necessarily need to receive an actual drug each and every day between the bookends of the period in which a per diem

---

[23] ***See:***  Internet-Only Manual 100-02 – ***see:***  https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS012673.
[24] ***See:***  Table 1 in the sampling memo prepared for this litigation by the Analysis Group (herein, the "Sampling Memo") which indicates claim lines at issue for per diem and drug services represent 848 claim lines.
[25] ***See:*** Participating Provider Agreement – pages 7-8.
[26] ***See:***  AISWY00001135-1289.
[27] ***See:***  AISWY00001230-1238; see also AISWY00001150-1151.
[28] ***See:***  AISWY00001141.
[29] ***See:***  AISWY00001230.
[30] ***See:***  BCBSWY 003129.

may be billed (i.e., the day therapy is initiated and the day it is discontinued).[31]  Rather, billing the per diem is appropriate so as long as the patient has access to the prescribed treatment and the billing provider anticipates maintaining responsibility for the patient, remains accountable for the provision of the care the patient is anticipated to receive, and remains responsible for acquiring the required resources to meet those anticipations.[32]  I understand that AIS considers a patient "on service" and assumes this responsibility for their care once the patient begins treatment and has access to AIS's medications.[33]

21.     The NHIA Standards place a 72-hour interval limit after which the per diem definition no longer applies.  In other words, the per diem definition does not apply if home infusion therapy applications are spaced more than 72-hours apart.  Intrathecal infusions are continuous; therefore, the patient always has access to the prescribed therapy, there are no intervals, and the 72-hour rule is not applicable.[34]

22.     The concept of billing a per diem for a day on which there is no face-to-face or otherwise direct encounter with a patient is not novel within the healthcare industry.  For example, the Medicare hospice benefit[35] reimburses hospice providers a daily rate regardless of whether services are provided on any given day – including days when no services are provided.[36]  Rather, the daily payment is intended to cover costs that hospices incur over the course of time that the patient is eligible for, and continues to elect, hospice services.  This is analogous to AIS's continuing responsibility for patients once they begin treatment, as the patient has constant access to AIS's infused medication as well as the services AIS makes available to patients during service, such as the all-day, every-day telephone support AIS's team of nurses and pharmacists provides under the Care Connect or financial concierge programs.[37]  The expenditures associated with maintaining this program fit directly within the contours of specific NHIA Standards described in the following paragraph.

23.     This is further supported by the "bundled" approach of the per diem reimbursement model, in which covered supplies and services are billed under a single code that is "intended to compensate for costs" necessary to ensure home infusion pharmacies can continue providing access to treatment.[38]  In fact, the conceptual framework of per diem reimbursement for home infusion services is corroborated by government reporting summarizing industry practices.  Specifically, the United States Government Accountability Office ("U.S. GAO" or just "GAO") published a report in June 2010 titled "*Home Infusion Therapy – Difference between Medicare*

---

[31] *See:*  AISWY00001230
[32] *See:*  AISWY00001230
[33] *See:*   Exhibit A to DEFENDANT'S ANSWER AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL.
[34] *See:*  AISWY00001230
[35] The Medicare hospice benefit covers a broad set of palliative services for beneficiaries who have a life expectancy of six months or less – see 42 CFR § 418.
[36] *See:*  MedPAC Hospice Payment Basics – November 2021 – published by the Medicare Payment Advisory Commission at https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_hospice_final_sec.pdf
[37] *See:*  https://aiscaregroup.com/wp-content/uploads/AIS_Patient_CareConnect.pdf; https://aiscaregroup.com/our-divisions/targeted-drug-delivery/billing-financial-support/.
[38] *See:*  AISWY00001141 and AISWY00001231.

*and Private Insurers' Coverage*" (herein referred to as the "GAO Home Infusion Report").[39]   The GAO Home Infusion Report describes a study performed by GAO to help inform Medicare policy by reviewing home infusion coverage policies and practices to compare Medicare Fee-For-Service and private health insurers (including both commercial and Medicare Advantage ("MA") plans).[40]

24.     The description of the method by which most health insurers pay providers for home infusion service presented in the GAO Home Infusion Report align completely with the NHIA Standards.   In fact, the GAO Home Infusion Report – an excerpt of which is presented in the figure below – describes the payment methodology which BCBSWY adhered to before claims were disputed and which aligns with the NHIA Standards.[41]

**Figure 1:  Excerpt from GAO Home Infusion Report[42]**



> Most of the health insurers in our study pay for the other components associated with home infusion therapy using a bundled payment per day of therapy—known as a "per diem."[38] This daily rate may cover services, such as pharmacy services, equipment and supplies, and care coordination. The per diem payment amount is based on the type of therapy provided and varies depending on the complexity and frequency of the treatment. For example, the per diem payment for a simple infusion administered once a day might be $75, whereas the per diem for a daily complex infusion with multiple drugs might be $225.
>
> [38]Health insurers use a uniform set of reimbursement codes for the per diem payment. These standard codes—known as "S codes"—were among those developed to meet the requirements of the Health Insurance Portability and Accountability Act of 1996. The act required HHS to adopt standard code sets for describing health-related services in connection with financial and administrative transactions, and required members of the health care industry to use these code sets.

25.     The per diem payment model and the concept that the per diem is paid daily is explicitly presented in the GAO Home Infusion Report, as illustrated in the figure below.

---

[39] GAO-10-426
[40] GAO-10-426, page 2 and 3.  Specifically, the GAO Home Infusion Report describes its approach to determining coverage and payment for home infusion therapy under non-Medicare Fee-For-Service health insurers as follows:  "*To determine coverage and payment for home infusion therapy under other health insurers, we interviewed officials from a selective sample of health insurers. We contacted officials of MA plans and commercial plans sponsored by six of the largest MA organizations and one additional commercial health plan. Five of the six MA organizations responded within our chosen time frame and were included in our study. This selective sample of MA organizations enrolled about 45 percent of all MA beneficiaries as of June 2009.*"
[41] DEFENDANT'S ANSWER AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL.
[42] GAO-10-426, page 20.

Figure 2:  GAO Home Infusion Report Figure 4[43]



Figure 4: Hypothetical Example of Home Infusion Therapy Payment in a Commercial Health Plan

26.     The NHIA Standards describe the types of services a billing provider renders that are covered by the bundled per diem rate.  These services, as identified by NHIA and echoed in the GAO Home Infusion Report, track with each component of the HCPCS Level II descriptor in addition to establishing the types of services represented by per diem codes such as S9328; specifically,[44]:

    a.   Professional pharmacy services which include:

        i.   Dispensing medication;

        ii.   Clinical monitoring;

        iii.   Care coordination[45];

        iv.   Provision of supplies and equipment[46]; and

        v.   Other categories of pharmacy professional services (e.g.; continuing education to professional pharmacy staff, maintaining accreditation[47], certification fees, and others listed across AISWY00001233-34).

    b.   Administrative services which include:

        i.   Administering coordination of benefits with other insurers;

        ii.   Performing billing functions;

---

[43] GAO-10-426, page 19.

[44] *See:*  AISWY00001231-1236.

[45] Note that this is a core element of the HCPCS Level II descriptor, but it is included as a sub-bullet under Professional pharmacy services in the NHIA Standards.  Nonetheless, the types of activities which fall under Care Coordination are described in the NHIA Standards and include [a] 24 hour per day, 7 day per week availability for questions and/or problems; [b] development and monitoring of nursing care plans; [c] patient discharge services; and other services listed at AISWY00001135-1289.

[46] Footnote 41 is applicable - this is a core element of the HCPCS Level II descriptor, but it is included as a sub-bullet under Professional pharmacy services in the NHIA Standards.

[47] AIS is accredited by Utilization Review Accreditation Commission (known as "URAC") as a (1) Medicare Home Infusion Therapy Supplier, (2) Infusion Pharmacy, and (3) Specialty Pharmacy. AIS is also accredited by the Accreditation Commission for Health Care and the Pharmacy Compounding Accreditation Board (*See:* AISWY00005556-68).

10

      iii.    Maintaining computer clinical and administrative information systems;

      iv.    Obtaining prior authorizations;

      v.    Performing account collection activities;

      vi.    Maintaining inventories of drugs, equipment, administration supplies, and office supplies; and

      vii.    Others listed at AISWY00001235-1236.

c.  Other supported costs such as the following:

      i.    Property taxes;

      ii.    Inventory carrying costs;

      iii.    New product research and development;

      iv.    Community commitment and charitable donations;

      v.    Asset depreciation; and

      vi.    Others listed at AISWY00001236.

27.     As outlined in the paragraph above, the NHIA Standards list many activities that a provider such as AIS may perform to satisfy the HCPCS Level II descriptor of providing administrative services, professional pharmacy services, care coordination, and all necessary supplies and equipment.  The NHIA Standards do not, however, suggest that ***all*** of the listed HCPCS Level II descriptor elements need to be provided in order to bill the per diem as BCBSWY insinuates.[48]

28.     The NHIA Standards also identify what products and services ***are not*** included in the definition of per diem.  This includes the other AIS services potentially at issue in this matter – drugs, nursing, and other services provided when not otherwise paid for through per diem coding for an HIT episode.[49]

29.     The NHIA Standards are clear that S9328 is for use with an implanted pain pump.  This is evident on the table presented in the NHIA Standards on AISWY00001244 which differentiates services provided under S9328 from other pain management per diem codes; specifically:

    a.    S9326 is a per diem code which represents continuous home infusion therapy where "continuous" is defined as 24 hours or more of care.

    b.    S9327 is a per diem code which represents intermittent home infusion therapy where "intermittent" is defined as less than 24 hours of care.

---

[48] ***See***:  Exhibits 3 and 4 to the Complaint.
[49] ***See:***  AISWY00001237-1238

c.  S9325 is a per diem code which represents home infusion therapy that is not otherwise classified with respect to continuous, intermittent, or via an implanted pain pump.

d.  S9328 is, in contrast to the three codes above, for use with an implanted pain pump.

30.  Finally, I understand from Counsel for AIS that BCBSWY does not have a separate public-facing billing policy or manual related to HIT providers in general or specific to those that bill claims under code S9328 and that it applies the NHIA Standards to such claims.[50]

**B.  _Opinion 2: Documents produced in this matter for the 302 sampled claim lines (202 AIS and 100 BCBSWY) confirm that AIS was providing drugs and services that met the NHIA Standards._**

31.  As referenced above in footnote 24, I understand that the Analysis Group prepared a Sampling Memo which was the basis for an agreed upon sampling design for use by both parties involved in this litigation.[51]  The Sampling Memo details two sets of claims at issue – the at-issue claims identified by AIS and those identified by BCBSWY.  The 848 AIS-identified claims reflect claim lines submitted by AIS to BCBSWY where AIS believes they are entitled to additional payment.[52]  Of those 848 claim lines; Per Diem services represent 629 claim lines, Drugs represent 217 claim lines, and Other services represent two claim lines. A total of 202 claim lines were sampled from the AIS-identified claim lines – 100 Per Diem claim lines, 100 Drug claim lines, and the two claim lines for Other services.

32.  The second set of at-issue claim lines are the 206 identified by BCBSWY where they believe they have overpaid AIS and are entitled to recoup the payment.[53]  These claim lines relate solely to Per Diem services. A total of 100 claim lines were sampled from the BCBSWY-identified claim lines. Each of these claim lines were reviewed in connection with the findings of this report. These amounts are presented in the table below.

**Table 1:  Summary of Claim Lines at Issue**

|  | Per Diem | Drug | Other | Total |
|---|---:|---:|---:|---:|
| **AIS Identified** | 629 | 217 | 2 | 848 |
| **AIS Sample** | 100 | 100 | 2 | 202 |
| **BCBSWY Identified** | 206 | 0 | 0 | 206 |
| **BCBSWY Sample** | 100 | 0 | 0 | 100 |

[50] This is consistent with what appears to be an excerpt of the Home Infusion Provider Manual produced at BCBSWY003128-29.
[51] April 17, 2023, memo from Analysis Group to Sheppard Mullin and Holland & Hart regarding "_Joint Sampling Memo for AIS v. BCBS of Wyoming matter_" as well as an updated memo produced at AISWY00005569 - AISWY00005580.
[52] 2024.04.17 AIS Samples - With Client Data.xlsx produced at AISWY00001841-42.
[53] 2024.04.17 BCBSWY Sample – With Client Data.xlsx produced at AISWY00001841-42.

33.     Documents produced in this matter for the 302 claim lines confirm that AIS was providing services that met the NHIA Standards and the excerpted BCBSWY Home Infusion Manual described above.  Specifically, I reviewed the documentation produced by AIS to assess whether they reasonably supported that patients had pain pumps and had access to and were receiving continuous infusions of AIS's medication (i.e., drugs) via their pain pumps for both the AIS and BCBSWY Samples.  I also assessed this documentation to confirm whether it supported that AIS was performing services which satisfy the HCPCS Level II S9328 descriptor of providing administrative services, professional pharmacy services, care coordination, and all necessary supplies and equipment.[54]  Finally, my review assessed whether Drugs and Other services were appropriately billed in accordance with the NHIA Standards.  Specifically, my review focused on assessing the following:

    a.  **Per Diem and Drug claim lines**:  My review of Per Diem and Drug lines assessed whether the services billed were supported by a combination of the following document types[55]:

        i.  An order for HIT medication signed by the prescribing provider for the medication;

        ii.  A compounding record outlining the compounding process including the instructions, drugs/supplies used and processes. This included the specific drug inventory and amount of the drug compounded; and

        iii.  Evidence of delivery[56].

    b.  **Other claim lines**:  My review of claim lines for non-per diem and non-drug claims focused on assessing whether underlying documentation reasonably supported the provision of the service and that it would have not been otherwise paid under the per diem framework.

    c.  For all claim lines, I confirmed with AIS's Counsel whether the claim line was associated with a claim that was rebilled to a different payor, the patient's insurance had changed, or the claim should not otherwise have been billed.

34.     Exhibits 3, 4, 5 and 6 present by-claim details of my review findings for each claim line.  The following two paragraphs summarize my findings.

---

[54] My review of billing documentation also identified that AIS billed under the National Provider Identifier ("NPI") 1336243393 (*e.g., see:*  AISWY00001968) and NPI 1346742376 (*e.g., see:* AISWY00001937).  The significance of this is that confirms AIS is associated with two taxonomy codes identified in the NHIA Standards – 3336H0001X (Home Infusion Therapy Pharmacy) and 3336S0011X (Specialty Pharmacy) – *see:* https://npiregistry.cms.hhs.gov/provider-view/1336243393 and https://npiregistry.cms.hhs.gov/provider-view/1346742376.

[55] These documents are the primary source of documentation which, in my experience, substantiate the provision of services related to per diem and drug claim billing.  BCBSWY has indicated that it has no policy regarding home infusion billing which would provide other criteria – *see:* Exhibit 3 to the Complaint.

[56] It is common in the healthcare industry to provide proof of delivery via a "delivery ticket" or similar documentation which summarizes information regarding the shipping or provision of a medical device or product to the recipient.

35.    AIS Sample:

a.    **Per Diem claim lines**: The 100 Per Diem claim lines were associated with 2,129 units (i.e., days). Counsel for AIS identified 6 Per Diem claim lines as not relevant to the disputed issues by which were associated with 130 days. Excluding the non-relevant claim lines results in 94 Per Diem claim lines associated with 1,999 days in the sample relevant to this litigation. I found that 90 of the 94 relevant Per Diem claim lines were fully supported by the underlying documentation described above. The 90 Per Diem claims with supporting documentation were associated with 1,907 days – or just over 95% of the days associated with the relevant Per Diem sample.

i.    I observed that two Per Diem claim lines were not fully supported by underlying documentation for the specific claim/date of service sampled. However, the documentation demonstrates and reasonably supports the fact that the medication was ordered and delivered to the patient for the specific date of service sampled.[57]

ii.    I observed that two Per Diem claim lines were not fully supported by underlying documentation for the specific claim/date of service sampled. Available documentation confirms that drugs were ordered, however; the medical record does is missing both the compounding record and evidence of delivery.[58]

b.    **Drug claim lines:** Counsel for AIS identified 30 Drug claim lines as not relevant to the disputed issues. Excluding the non-relevant claim lines results in 70 Drug claim lines in the sample relevant to this litigation. I found that 68 of the relevant 70 Drug claim lines were fully supported by the underlying documentation described above.

i.    I observed that one Drug claim line was not fully supported by underlying documentation for the specific claim/date of service sampled. However, the documentation demonstrates and reasonably supports the fact that the medication was ordered and delivered to the patient for the specific date of service sampled.[59]

ii.    I observed that one Drug claim line was not fully supported by underlying documentation for the specific claim/date of service sampled. Available documentation confirms that drugs were ordered,

---

[57] ███████████████████████████████████████████████████████.
[58] ███████████████████████ ███████████████████████████████
[59] ███████████████████████████████████

however; the medical record does is missing both the compounding record and evidence of delivery.[60]

   c.     **Other claim line:** The Other claim lines represent DME delivery, set up, and/or dispensing service component of another HCPCS code, billed under the A9901 code. I found that this was supported by underlying documentation which confirmed that the patient had an intrathecal pain pump, was obtaining medication from AIS, and actively receiving therapy.

36.     BCBSWY Sample:

   a.     All 100 claim lines in the BCBSWY Sample are Per Diem claim lines related to S9328. The number of units/days for the Per Diem claims was not provided in BCBSWY's Sample file. My review of the underlying documentation contraindicates BCBSWY's position that monies should be recouped from claims in the BCBSWY sample.

   b.     Accordingly, BCBSWY's assertion that it is entitled to recouping payments issued on these claims is not supported based on an analysis of the underlying medical record documentation supporting that the services were in fact rendered.

   **C.**  **Opinion 3 - AIS was underpaid by** ▮▮▮▮▮ **across the claim lines subject to sampling in AIS's Sample.**

37.     My analysis of the samples selected for this litigation yielded the following findings:

   a.     My analysis of the 100 sampled Per Diem claims indicates that BCBSWY underpaid AIS by a total of ▮▮▮▮▮ This amount was determined based on the inputs listed below and Exhibit 3 provides a detailed listing of my findings.

        i.     As described above, Counsel for AIS identified 6 Per Diem claim lines as not relevant. These have been assigned a $0 underpayment.

        ii.     Similarly, the four Per Diem claim lines missing certain pieces of underlying documentation were assigned a $0 underpayment.

        iii.     Underpayments associated with the remaining 90 Per Diem Claims were calculated by multiplying the number of days billed under S9328 by ▮▮▮[1] and subtracting any amounts already paid by BCBSWY.

---

[60] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[61] Counsel for AIS informed me that Counsel for BCBSWY stated that BCBSWY does not maintain a HIT fee schedule and that they never provided AIS with a fee schedule. Documentation produced in this matter indicates that per diem payment amounts ranged somewhere between ▮▮▮▮▮▮ The ▮▮ dollar rate is listed in AISWY0000000328 and AISWY00001720; however, there is an apparent typo, or this is associated with a different HCPCS Level II (S9338). The ▮▮ rate is evident from actual

b. My analysis of the 100 sampled Drug claims indicates that BCBSWY underpaid AIS by a total of ███████ This amount was determined based on the inputs listed below and Exhibit 4 provides a detailed listing of my findings.

    i. As described above, Counsel for AIS identified 30 Drug claim lines as not relevant.  These have been assigned a $0 underpayment.

    ii. Similarly, the two Drug claim lines missing certain pieces of underlying documentation were assigned a $0 underpayment.

    iii. Underpayments associated with the remaining 68 Drug Claims were calculated by multiplying the total quantity of drugs provided by the associated Average Wholesale Price ("AWP") and subtracting any amounts already paid by BCBSWY.[62]

c. My analysis of the two Other claims indicates that BCBSWY underpaid AIS by a total of ██████[63]

38. Using the stratification detailed in Tables 2, 3, and 5 in the Sampling Memo, I extrapolated the AIS Claim sample results to the AIS Claims population and the BCBSWY Claim sample results to the BCBSWY Claims population.  For each sample claim line, I calculated the difference between what BCBSWY should have paid (i.e., the applicable reimbursement rate at the time multiplied by the number of days billed) and subtracting any amounts already paid by BCBSWY.

39. I calculated the estimated extrapolated amounts using a statistical software package developed by the HHS Office of Inspector General called RAT-STATS[64] as well as R[65], the statistical application referenced in the Sampling Memo.  A summary of the calculations performed is as follows:

---

claims data – specifically, 144 of the 206 claims lines in the BCBSWY sample frame indicate a ██ allowed amount for each day a Per Diem was billed (based on analysis of 2024.04.17 BCBSWY Sample - With Client Data produced at AISWY00001841-42).  Of the remaining BCBSWY sample frame claim lines, 61 indicate a total allowed amount of ███ (i.e., suggestive that one per diem was allowed at a rate of ██ ) and the remaining indicates an allowed amount of ██

[62] *See:*  AISWY00001658 indicates BCBSWY reimbursed providers for drugs using AWP.  The AWP source is listed as Medispan – a provider of online drug pricing reference data that is available on a subscription basis.  I was provided AWP information from AIS's database resources and not Medispan.  There were some instances where my calculations yielded a lower expected payment amount than what was paid by BCBSWY and I incorporated in my damages calculations.  There were also instances where my calculations yielded an expected amount in excess of the billed amount and, when this occurred, I limited my damages calculate to the lessor of the billed amount or the calculated allowed amount.  This is consistent with industry norms and language contained at Complaint Exhibit 1; for example, PDF p. 24 (Wyoming Blue Select PPO Network Schedule).

[63] This is based on discussions with AIS indicating that reimbursement for A9901 was ██████ per unit.

[64] RAT-STATS is a free statistical software package that providers can download to assist in a claims review. The package, created by OIG in the late 1970s, is also the primary statistical tool for OIG's Office of Audit Services.  I regularly utilize RAT-STATS for evaluating statistical samples in my work.

[65] I used the *ci.strat* function within the *asbio* package available in R. *See,* https://cran.r-project.org/web/packages/asbio/asbio.pdf.

a.    Calculate the difference between what BCBSWY should have paid each claim line less any amounts already paid by BCBSWY (each sampled claim's underpayment).

b.    Sum the underpayments across the sampled claims in each stratum.

c.    The average underpayment per claim point estimate is calculated by dividing the total underpayment in the Sample stratum by the total number of claims sampled in each stratum.  This average underpayment per claim point estimate is then multiplied by the total number of claims in the stratum to arrive at an extrapolated total underpayment point estimate for the stratum.

d.    Total underpayment point estimates for each stratum are summed across all strata to determine the overall total underpayment extrapolated point estimate.

40.    Interest on outstanding amounts is not included in the extrapolated underpayments. For the purposes of determining interest, I have assumed that the payment "due date" is 365 days.[66] To determine prejudgment interest, I use the midpoint of service dates for the population, plus 425 days (the 365 days for claim submission plus 60 days for claim payment[67]).  For example, the Per Diem dates range from 10/3/2018, through 11/30/2023.  The midpoint of this period is 5/2/2021. Adding 425 days to this midpoint is 7/1/2022.  Using the midpoint assumes an even distribution of unpaid or underpaid claims throughout the period examined. Interest on underpayments is calculated from 7/1/2022 through 7/12/2024.[68]  I understand that the Agreement is governed by Wyoming law and that unless a contract specifies a different rate, prejudgment interest is 10 percent, compounded annually.[69]

41.    The table below summarizes my calculation of damages in this matter by claim line type and in total.  Exhibits 7 and 8 include a detailed summary of these calculations.

| Claim Line Type | Extrapolated Damages Point Estimate | Pre-Judgment Interest | Total |
|---|---|---|---|
| Per Diem | ████████ | ████████ | ████████ |
| Drug | ████ | ████ | ████ |
| Other | ██ | ████ | ████ |
| Total | ████████ | ████████ | ████████ |

---

[66] **See:**  AISWY00001657 – Per website: "*Most insured groups have a timely filing deadline of one year from the date of service, however, a few groups have a deadline of 60 days.*"

[67] BCBSWY materials do not define a time period for claim adjudication.  60-days is consistent with my experience with other payors.

[68] I calculated interest through the date of my report.  I will provide an updated calculation prior to trial.

[69] **See**: WY Stat § 1-16-102 (2022); https://law.justia.com/codes/wyoming/2022/title-1/chapter-16/article-1/section-1-16-102/

[70] There was no extrapolation of Other claims because the population was limited to two claim lines.  Accordingly, the interest calculation is based on actual claim line submission dates.

17

## VI.   <u>POSSIBLE SUPPLEMENTATION OF THIS REPORT</u>

31.     This report presents a summary of my work to date.  I reserve the right to revise and refine this report as additional work is performed, and additional information and deposition testimony is received.

Submitted by: _____   **Dated:  July 12, 2024**

**Peter L. Dressel**

EXHIBIT 1

## PETER L. DRESSEL

**ACADEMIC BACKGROUND:**

| University of Virginia | B.A. – Economics, Finance Concentration | 2001 |
| George Washington University | M.B.A. – Concentration in Accounting | 2008 |

**PROFESSIONAL AFFILIATIONS:**

Health Care Compliance Association, Member

Healthcare Financial Management Association, Member

American Health Lawyers Association, Non-Attorney

**EMPLOYMENT:**

| November 2003 – Present: | Senior Managing Director (current position), FTI Consulting, Inc. |
| May 2002 – November 2003: | Senior Consultant (final position), KPMG LLP |
| September 2001 – May 2002: | Consultant (final position), Arthur Andersen LLP |

**SELECT PROFESSIONAL EXPERIENCE:**

*Consulting Focused*

- Independent Review Organization ("IRO") experience:  served as IRO for hospital, skilled nursing facility, home health, and durable medical equipment organizations operating under Corporate Integrity Agreements with the U.S. Department of Health and Human Services Office of Inspector General ("HHS OIG").

- Compliance Department Operational Improvement:  assisted hospitals, children's hospitals, skilled nursing facility organizations, revenue cycle, and home health organizations assess and implement improvements to their compliance functions through use of data analysis and strengthened processes.  Provided benchmarking analyses of different payment codes, such as Diagnosis Related Groups (DRGs and MS-DRGs) and Resource Utilization Groups (RUGs).

EXHIBIT 1

- Due Diligence:  assisted clients in the regulatory due diligence review of potential acquisitions in the hospital, skilled nursing facility, home health, hospice space, durable medical equipment, infusion, and behavioral health. Performed review of policies and procedures, performed analysis of historical claims data, and led clinical reviews.

*Investigation Focused*

- Response to Department of Justice ("DOJ") and HHS OIG Inquiries:

  o Assisting multiple providers of Applied Behavioral Analysis ("ABA") therapy respond to DOJ inquiries related to billing, coding, and provider certification issues and their impact on TRICARE payments.

  o Assisted a publicly traded operator of Skilled Nursing Facilities ("SNFs") address a DOJ inquiry related to relationships with medical directors and potential Stark Law and Anti-Kickback Statute violations.

  o Assisted multiple Inpatient Rehabilitation Facility ("IRF") organizations in addressing regulatory inquiries.  Led teams of clinical reviewers, statisticians, and consultants in the review of a government selected sample of claims for both admission and coding concerns as well as the development of various extrapolation scenarios.  Developed settlement scenarios and methodologies.

  o Assisted a national Home Health Agency organization in responding to a multi-agency government inquiry.  Work involved data analysis and a clinical review of patient medical records.  Data analysis focused on industry wide comparisons of therapy visits, episodes per patient and patient acuity as well as statistical analysis of a government patient sample.

  o Assisted multiple SNFs in responding to DOJ inquiries regarding RUG levels and medical necessity concerns.

  o Assisted multiple global medical device manufacturers in responding to DOJ-inquiries related to sales and marketing of devices for potentially off-label purposes.  Analyses included internal sales data, CMS-published utilization data, as well as publicly available Medicare claims data sets.

  o Assisted multiple hospital organizations in responding to Medicare outlier payment inquiries.

  o Assisted an independent outpatient diagnostic imaging organization in resolving a Medicare billing inquiry of its policies and procedures covering physician supervision of diagnostic tests.

EXHIBIT 1

- Other Government-related Matters:

  o Assisted a southeast SNF in responding to a Zone Program Integrity Contractor ("ZPIC") audit.

  o IRS Dispute:  Led the data collection and analysis efforts related to a hospital organization's disputed change of bad debt formula. Collected, verified, and analyzed write-off and recovery data for over 150 hospitals transitioning from a non-accrual experience ("NAE") method of accounting-based formula to one based on the Black Motor Co. formula.

  o Assisted a provider of dental care services in analyzing billings rendered to the California Medicaid Program and the California State Children's Health Insurance Program.

- Self-Disclosure and Voluntary Repayment Matters:

  o Assisted a mid-west hospital system complete an OIG Self-Disclosure related to Medicare Hyperbaric Oxygen services.

  o Assisted an academic medical center in reviewing billings related to physician professional fees across a broad range of departments.  The review resulted in voluntary repayments to the Medicare and Medicaid programs.

  o Conducted medical necessity and medical documentation reviews for hospital, IRF, inpatient psychiatric facility ("IPF"), and home health claims.

- Commercial Matters:

  o Assisted a revenue cycle and healthcare technology company with a comprehensive risk assessment of its underlying businesses which were the result of a recent merger. Project encompassed a detailed, multi-site review of the company's operations, systems, policies and procedures in order to identify and prioritize potential compliance risks; develop remedial actions to mitigate those risks.

  o Assisted a hospital system in a post-acquisition dispute regarding its covenant obligation to provide certain levels of charity and uncompensated care.  This work focused on assessing and validating methods by which patients were determined to have qualified for charity or other uncompensated care as well as the methodology by which bad debt expense was calculated.

EXHIBIT 1

      o   Assisted a publicly traded hospital company in securities litigation arising from revised earnings projection.

## EXPERT TESTIMONY

*Ruckh v. CMC II, LLC et al* – U.S.D.C. for the Middle District of Florida Tampa Division, Civil Action Number 8:11 CV 1303 SDM-TBM – provided deposition and trial testimony on behalf of defendants Consulate Management Company, operators of Skilled Nursing Facilities, related to alleged up-coding of RUGs.

*United States of America et al v. Kinetic Concepts, Inc.* – U.S.D.C. for the Central District of California Western Division, Civil Action Number 2:08-cv-01885. Expert report submitted on behalf of defendant Kinetic Concepts, Inc. but have not yet provided deposition or trial testimony. Matter involves allegations made under the False Claims Act related to the billing of certain wound therapy durable medical devices.

*Sarasota Doctors Hospital, Inc. and Englewood Community Hospital, Inc. v. Sarasota County and Sarasota County Public Hospital District* – Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida, Case No. 2011 CA 001588 NC consolidated with 2011 CA 001620 NC. Provided deposition and trial testimony for plaintiff hospitals.

*United States of America and the State of California ex rel. Martin Mansukhani v. Prime Healthcare Services, Inc., et al.* – U.S.D.C for the Central District of California, Eastern Division, Case No. 5:18-cv-00371-RGK-SHK – provided 30(b)(6) deposition testimony and submitted an expert report on behalf of defendants Prime Healthcare Services related to healthcare billing and coding of implantable devices.

*National Hospice Management, Inc. v. Christine Murray-Kaplan* – AAA Arbitration – Case No. 01-19-0002-2961.

*Lifecare Haven Holdings, LLC v. Becky Richardson, Kelly Seales, and Mitzi Thomas* – District Court of Dallas County, Texas – Cause No. DC-19-08627. Provided testimony on behalf of Lifecare Haven Holdings in a post-acquisition dispute regarding Medicare home health services.

*Bond Pharmacy, Inc. d/b/a AIS Healthcare, Claimant v. Humana, Inc. Respondent* – AAA Arbitration – Case No. 01-20-0015-7249.

*Liberty Dialysis – Hawaii LLC, a foreign limited liability company, Liberty Dialysis – North Hawaii LLC, a foreign limited liability company v. Health Management Network, Inc., a Nevada corporation, Hawaii Mainland Administrators, LLC, a foreign limited liability company, and Multiplan, Inc., a New York corporation* – First Circuit Count of Hawai'i – Civil No. 14-1-2275-10 GWBC. Provided deposition testimony on behalf of plaintiffs regarding damages – trial pending.

EXHIBIT 1

*Bond Pharmacy d/b/a Advanced Infusion Solutions, Plaintiff, v. Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield, Defendant* – United States District Court for the Easter District of Virginia (Alexandria Division) – Case No. I:22-cv-01343-CMH-IDD.  Provided testimony on behalf of Plaintiff Bond Pharmacy regarding payments for home infusion services.

*Bond Pharmacy, Inc. d/b/a AIS Healthcare, Claimant v. Anthem Insurance Companies, Inc. Respondent* – JAMS Arbitration – Reference No. 5410000286.

*Bond Pharmacy, Inc. d/b/a AIS Healthcare, Claimant v. Blue Cross of California, d/b/a Anthem Blue Cross and Blue Shield, Respondent* – JAMS Arbitration – Reference No. 5410000280.

*Fresenius Medical Care Tampa LLC, et al. v. Anchor Benefit Consulting, Inc.,* - Circuit Court of the Ninth District in and for the Orange County - Civil Action No. 2022-ca-004174-O.  Submitted an expert report regarding damages on behalf of Plaintiffs Fresenius Medical Care Tampa, et al.  Deposition and trial testimony pending.

*Molly C. and Naomi L., on Behalf of Themselves and All Others Similarly Situated, Plaintiffs, v. Oxford Health Insurance, Inc., Defendant* – United States District Court for the Southern District of New York – Case No. 1:21-CV-10144-PGG.  Submitted an expert report on behalf of Defendant Oxford Health Insurance regarding behavioral health billing and reimbursement. Deposition and trial testimony pending.

*TEAM HEALTH HOLDINGS, INC., on behalf of itself and affiliated emergency medicine practice groups, Claimants, v. CENTENE CORPORATION, on behalf of itself and its applicable corporate affiliates, Respondents* – AAA Arbitration – Case No. 01-23-0002-1942

## PRESENTATIONS AND PUBLICATIONS

*"FCA Investigation and Litigation Trends and Topics Update";* 7th Annual Healthcare Litigation and Compliance Program; September 29, 2022; Chicago IL (with David J. Pivnick and Michael J. Podberesky of McGuireWoods).

*"Discharge Codes: Impact on the Post-Acute Care Transfer Policy - Risks and Rewards";* LORMAN; April 30, 2020; Webinar.

*"How Healthcare Providers Can Make the Best Use of Their Data"*; Nashville Healthcare Fraud Conference; December 6, 2018; Nashville, TN (with Jeff Gibson of Bass, Berry, & Sims and Greg Russo of Berkeley Research Group).

*"Selecting the Proper Statistical Sample with Different Types of Services"*; American Conference Institute Life Sciences & Healthcare False Claims Litigation; May 23, 2018, New York, NY (with Michael Paulhus of King & Spalding and Bo Martin of Navigant).

EXHIBIT 1

*"Elements of a Successful Corporate Integrity Agreement"*; Health Care Compliance Association 2017 Compliance Institute; March 27, 2017, Washington D.C. (with JoAnne Little of LHC Group and Susan Gillin of OIG-HHS).

*"How does Medicare Reduce Payments?  Let us Count the Ways"*; King & Spalding 25th Annual Health Law & Policy Forum; March 21, 2016, Atlanta, Ga (with Mark Polston, Dan Hettich, and Chris Kenny of King & Spalding).

*"No Hiding Under the RUG"*; Dennis Barry's Reimbursement Advisor, June 2014.

*"Treble Damages and Your Bottom Line";* American Conference Institute Advanced Forum on False Claims and Qui Tam Enforcement; January 27, 2014, New York, NY (with Craig Margolis of Vinson & Elkins and James Thomas of PricewaterhouseCoopers).

*"Nowhere to Hide",* FTI Journal, June 2013.

*"Medical Necessity and Inpatient Rehabilitation"*, co-authored with Tim Renjilian; Dennis Barry's Reimbursement Advisor, March 2011.

## CONTACT INFORMATION:

Peter L. Dressel
Senior Managing Director
FTI Consulting, Inc.
555 12th Street Northwest
Suite 700
Washington, DC 20004

ph:  (202) 589-2328
fax: (202) 312- 9102
email: peter.dressel@fticonsulting.com

**Materials Considered**                                    **Exhibit 2**

All documents cited in the accompanying report of Peter Dressel included in its footnotes.

**<u>Produced Documents</u>**

1. AISWY00001135-1289

2. AISWY00001843-4489

3. AISWY00005537-5541

4. BCBSWY 003129

5. AISWY00005556

6. AISWY00005581

7. AISWY00001244

8. AISWY00001230-1238

9. AISWY00001150-1151

10. AISWY00001141

11. AISWY00001230

12. AISWY00001231

13. AISWY00001237-38

14. BCBSWY003128-29

15. AISWY00001968

16. AISWY00001937

17. AISWY0000000328

18. AISWY00001720

19. AISWY00001658

Materials Considered                                              Exhibit 2

**Legal Filings and Other Documents**

1. Complaint

2. Contract

3. AISWY00001841-42

4. Defendant's Answer and Counterclaim to Plaintiff's Complaint for Damages and Declaratory Relief and Demand for Jury Trial

5. [19-1] 2023-05-09 Answer to Complaint - Exhibit A.pdf

6. Participating Provider Agreement

7. AISWY00005569 - AISWY00005580

**Public Data Sources**

1. Pain Pump descriptions from https://www.upmc.com/services/neurosurgery/spine/treatment/pain-management/intrathecal-pump

2. Healthcare Common Procedure Coding System ("HCPCS") published by The Centers for Medicare & Medicaid Services ("CMS")

3. Current Procedural Terminology ("CPT") Manual, Professional Edition, published by the American Medical Association ("AMA")

4. "NEW CMS CODING CHANGES WILL HELP BENEFICIARIES" from https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/HCPCSReform.pdf

5. "Healthcare Common Procedure Coding System" " from https://www.cms.gov/medicare/coding-billing/healthcare-common-procedure-system

6. https://www.bcbswy.com/information/#:~:text=Blue%20Cross%20Blue%20Shield%20of%20Wyoming%20(BCBSWY)%20is%20complying%20with,adhere%20to%20the%20privacy%20regulations

7. HCPCS Codes from https://hcpcs.codes/

8. 21 Code of Federal Regulations 207.33

9. 21 U.S.C. § 360

**Materials Considered**                                    **Exhibit 2**

10. GAO-10-426

11. 45 CFR 162.1002

12. 65 FR 50312

13. 42 CFR § 418

14. HCPCS J Codes from https://hcpcscodes.org/jcodes

15. https://www.hipaaspace.com/Medical_Billing/Crosswalk.Services/HCPCS.to.NDC.Mapping/J1170

16. "CPT® purpose & mission" from https://www.ama-assn.org/about/cpt-editorial-panel/cpt-purpose-mission#:~:text=In%202000%2C%20the%20CPT%20code,and%20Accountability%20Act%20(HIPAA)

17. 42 U.S.C. §1395c

18. 42 U.S.C. §426

19. 42 U.S.C. §426-1

20. 42 U.S.C. Subchapter XVIII

21. 42 U.S.C. §1395c-1395i

22. 42 U.S.C. §1395j-1395w-6

23. Balanced Budget Act of 1997 §§ 4001-03 from (https://www.congress.gov/bill/105th-congress/house-bill/2015)

24. 42 U.S.C. §1395w-21 - 1395w-29

25. 87 FR 69404 at 70024

26. https://hcpcs.codes/s-codes/

27. Internet-Only Manual 100-02 from https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS012673.

28. 42 CFR § 418.

29. MedPAC Hospice Payment Basics – November 2021 – published by the Medicare Payment Advisory Commission from https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_hospice_final_sec.pdf (last accessed May 11, 2022)

30. Overview of AIS Patient Care Connect from https://aiscaregroup.com/wp-content/uploads/AIS_Patient_CareConnect.pdf

31. https://aiscaregroup.com/our-divisions/targeted-drug-delivery/billing-financial-support/

32. Provider view from https://npiregistry.cms.hhs.gov/provider-view/1336243393

33. URAC Accreditations Directory from https://www.urac.org/directory/accreditations

34. https://cran.r-project.org/web/packages/asbio/asbio.pdf.

Wyoming Exhibit 3





Wyoming Exhibit 4





Wyoming Exhibit 5





Wyoming Exhibit 6





EXHIBIT 7



EXHIBIT 7

EXHIBIT 7

EXHIBIT 7



EXHIBIT 7

EXHIBIT 7

EXHIBIT 7

EXHIBIT 7

EXHIBIT 7



EXHIBIT 7

Exhibit 8

