# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **BOND PHARMACY, INC., d/b/a**<br>**ADVANCED INFUSION SOLUTIONS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:23-cv-53** |
| **BLUE CROSS BLUE SHIELD of WYOMING,** | |
| **Defendant.** | |

## EXPERT REPORT OF JOSEPH MALATESTA

**Description of Engagement**

## Scope of Work

1. I have been engaged by Counsel for the Defendant, the law firm of Hathaway & Kunz, LLP, that I, Joseph Malatesta, provide these expert opinions regarding the Participating Provider Agreement between Bond Pharmacy, Inc., d/b/a Advanced Infusion Solutions (AIS or Bond Pharmacy) (Plaintiff) vs Blue Cross Blue Shield of Wyoming (BCBSWY) (Defendant). I was also asked to provide an opinion based on my years of experience as to whether said Participating Provider Agreement is consistent with the home infusion agreements I have experienced and if this Participating Provider Agreement provides for intrathecal reservoir pump refills in place of service home (POS 12) or physician's office. This report has been prepared for use only in the litigation referenced (Civil Action No. 1:23-cv-53). The facts and experience on which I relied in forming the opinions expressed in this report are cited throughout the report. The documents on which I relied or considered are referenced in this report and are listed in this Report. The opinions expressed herein are based on documents produced in this matter and information currently available to me. It is possible that new information may become available in the future that materially impacts my analysis and/or conclusions. Should this occur, I may revise my analysis and/or conclusions. The Expert Report is not to be construed as expressing opinions on matters of law, which are outside of my expertise, but rather on my 25 years of experience in the home infusion and ambulatory infusion industry.

## Materials Considered

2. A list of materials considered in preparing this report is attached as Attachment "A" to the report.

## Background

3. Home infusion therapy involves the intravenous or subcutaneous administration of drugs or biologicals to an individual at home. The components needed to perform home infusion include the drug (for example, antivirals, immune globulin), equipment (for example, a pump), and supplies (for example, tubing and catheters). Likewise, nursing services are necessary to train and educate the patient and caregivers on the safe administration of infusion drugs in the home. Nurses often play a large role in home infusion. Nurses typically train the patient or caregiver to self-administer the drug, educate on side effects and goals of therapy, and visit periodically to assess the infusion site and provide dressing changes. The nurse also charts the in-home visit in a nursing note. The nursing note is a regular practice in patient care. The nursing note is a detailed record that captures the comprehensive care provided by nurses but is not limited to, the nurse's observations, assessments, diagnoses, care plans, interventions, and evaluations of patient outcomes. A nurse or nursing manager/coordinator will contact the patient to schedule/confirm the nursing visits.

1

4.  The home infusion process typically requires coordination among multiple entities, including patients, physicians, hospital discharge planners, health insurance plans, home infusion pharmacies and nurses, and, if applicable, home health agencies. It also takes a multi-discipline team of pharmacists, nurses, patient care representatives, pharmacy technicians, warehouse personnel, and patient delivery representatives. Members of the care team are well equipped to assess, educate, and care for infusion patients. This team provides education and Plans of Care, both pharmacy and nursing. They closely monitor the patient's clinical status, dosage frequency, and treatment efficacy. The patient is usually assigned to a care team with a Clinical Pharmacist overseeing the care of the patient. Members of the care team will contact the patient periodically to ascertain information from the patient and/or caregiver i.e. updates on doctor's visits, supplies etc.  It is customary practice that the Clinical Pharmacist is in contact with the patient prior to dispensing drugs to the patient. The care team will then schedule a delivery to the patient in the home by the Patient Services Representative or delivery coordinator. This delivery coordinator will contact the patient or patient's caregiver of the scheduled date, time, and method (in-house, FedEx, UPS) of delivery.

5.  This case specifically calls in question in-home intrathecal pump service, maintenance, and management. In-home intrathecal pump service has been used for years to relieve chronic pain and severe spasticity. After a successful trial to determine if the pump will be effective, the pump will be surgically implanted. The intrathecal pump delivers a small dose of medication directly into the spinal column to help with chronic pain and/or spasticity. The pump resembles and is approximately the same size as a hockey puck. It is usually placed in the right or left lower abdomen.

6.  A catheter is attached to the pump and tunneled around the person's side to reach the spinal column. The catheter, which resembles a hollow piece of tubing, is secured into the intrathecal space in the spine. Both the pump and catheter are not visible by just looking at the skin. The whole system is completely implanted in the body.

7.  The pump is programmed to deliver medication as ordered by the managing physician. The medication will run continuously at a programmed rate from the pump reservoir through the catheter into the intrathecal space in the spine. This pump reservoir will need to be refilled from time to time by a registered nurse with specific training on reservoir refill.

8.  In this case, the relevant services provided, and fees reimbursed are governed by the Participating Provider Agreement between Bond Pharmacy, Inc. doing business as Advanced Infusion Solutions (AIS) and Blue Cross Blue Shield of Wyoming (BCBSWY) effective as of May 24, 2019, along with any attachments.  In acceptance of this Agreement, the parties agree to the terms and condition therein as well as the Policies and Procedures as outlined in the BCBSWY Manual for In-Network Health Care Professionals and Hospitals.

2

9.  A home infusion participating provider agreement and in some cases is referred to as an ancillary provider agreement or contract has three parts: drug(s), per diem and nursing. These components are reimbursed under the agreement by a fee schedule. However, the Participating Provider Agreement between Bond Pharmacy, Inc. doing business as Advanced Infusion Solutions (AIS) and Blue Cross Blue Shield of Wyoming (BCBSWY) effective as of May 24, 2019, did not have a fee schedule. In most cases, and in my experience, Providers, such as Bond Pharmacy make application with a Payor in this case BCBSWY for acceptance and entry into the Payor's Preferred Provider Network, allowing the Provider to provide service to the Payors members or participants. Depending on the Payor, the Provider, before being accepted into the Network, goes through a credentialing process. This process can be rigorous, challenging or simple depending on the Payor.

10. This matter involves Home Infusion Therapy services provided by AIS to BCBSWY members referred to in the agreement as "Participants" and specifically for home infusion pain management. The Participating Provider Agreement that I reviewed does not specifically address S Codes which are HCPCS codes specific to home infusion.

11. The Centers for Medicare and Medicaid Services, (CMS), maintain and annually update a list of procedural terminology (CPT) /healthcare common procedure coding system (HCPCS) codes, (the Code List), which identifies all the items and services included with certain designated health services (DHS) categories.

12. The Participating Provider Agreement, dated May 24, 2019, defines Claims as "*a complete and accurate request for payment submitted by the Provider for Covered Services that have been provided by the by the Provider to a Participant in accordance with the terms of the Participant's Benefit Document and this Agreement.*"

13. This dispute also centers on a review conducted by BCBSWY of claims submitted by AIS.  The review period was from January 1, 2019, through April 8, 2022, and was only a review of HCPCS S9328 claims which are for Pain Management. Based on the review BCBSWY concluded that AIS did not substantiate that AIS completed the services of administrative services; professional pharmacy services; and care coordination to submit claims for S9328. The HCPCS code S9328 does not appear in the Participating Provider Agreement dated May 24th, 2019.

---

10 see: https://www.cms.gov/medicare/regulations-guidance/physician-self-referral/list-cpt-hcpcs-codes
11 See: Participating Provider Agreement
12 See: https://www.cms.gov/medicare/regulations-guidance/physician-self-referral/list-cpt-hcpcs-codes

3

## Summary Opinion

14. Based on my 25+ years of experience, I have formed an opinion as described herein:

    **a. Opinion #1: There are two primary models by which payors (like BCBSWY) and home infusion providers (like AIS) typically contract for the provision of home infusion therapy services to patients who utilize intrathecal pumps.**

15. Based on my years of experience in the home infusion industry, I am very familiar with the methods and models by which payors such as BCBSWY typically contract with home infusion therapy ("HIT") providers, such as Advanced Infusion Solutions (AIS), to serve its participant patients who utilize intrathecal pumps. Based on my experience, there are two primary models that payors and providers utilize, depending on where the patients will have their intrathecal pumps refilled. The process by which the HIT provider receives reimbursement or payment for its services differs greatly between the two models. Below, I discuss these two models and the reimbursement/payment methodology for each.

    A.  Model #1: Pump refill occurs in patient's home.

16. Payors utilize this model when they have participants/patients who either are unable or are unwilling to physically go to their physician's office to have their pumps refilled with pharmaceuticals. In such circumstances, the payor will contract with a HIT provider to physically go to the patient's home and refill the pump there. It is my understanding, based on the Participating Provider Agreement in this case, that these are the services for which BCBSWY contracted with AIS.

17. In the model that applies when the HIT provider performs the refill of the patient's pump in the patient's home (place of service home), the payor (BCBSWY) contracts directly with the HIT provider (AIS) to have the provider's skilled nurse go to the patient's home to refill the pump reservoir. When this occurs, the prescribing physician does nothing more than write the prescription to order the medication. The physician forwards the prescription to the HIT provider (AIS) and then the HIT provider refills it into the patient's pump in the patient's home pursuant to the participating provider agreement the HIT provider has with payor. The HIT provider (AIS) would then bill the payor (BCBSWY), pursuant to that contract, for both the drug(s) it compounded and/or per diem(s) (as well as any nursing services). If a drug, per diem, or other service is excluded from payment or otherwise prohibited by the payor pursuant to the participating provider agreement then the payor would deny those claims.

18. Based on my years of experience, the Participating Provider Agreement between BCBSWY and Bond Pharmacy, Inc. doing business as Advanced Infusion Solutions, effective as of May 24, 2019, (the "Agreement"), is consistent with home infusion agreements that I have had experience with and in my opinion, you would not utilize this agreement for a buy and bill agreement with a physician practice.

4

B.   Model #2: Pump refill occurs in a physician's office.

19. Payors utilize this model for participate/patients who go to their physician's office to receive pump refills. When a physician refills a patient's pump in the physician's office (or other medical setting) the model is entirely different. It is entirely different because when the refill occurs in the patient's home (*i.e.,* Model #1, discussed above), the patient has a relationship and face-to-face interaction with the HIT provider. When the refill occurs in the physician's office (Model #2, discussed here), the patient has no relationship or face-to-face interaction with the HIT provider. For this reason, the reimbursement/payment model is different.

20. When a physician provides the pump refill himself/herself in the office, the physician still writes the prescription to order the medication, but then "buys and bills" the medication from the HIT provider. What this means is that the physician has an agreement with the HIT provider (AIS) to "buy" the medication the physician will refill into the pump, which the physician will subsequently "bill" to the payor (BCBSWY) pursuant to the physician's agreement with the payor (or, if the patient is uninsured, bill to the patient directly).

21. In this scenario, the physician may also provide management or oversight services to the patient between refills of the patient's pump. It is possible that the physician could contract with the HIT provider to have the HIT provider provide these management and oversight services, though I have never seen this occur in my experience. Under this Model #2, the physician provides these services because the physician has the relationship (and face-to-face interaction) with the patient. If the patient has any issue, the physician is the person they would call/contact.

22. If the physician were to contract with the HIT provider to provide management and oversight services, the HIT provider (AIS) would have to bill the physician for the services (the per diems) and then the physician would have to, in turn, bill the patient's payor (BCBSWY). That is because when the refill occurs in the physician's office, the HIT provider does not have a contract with the payor to provide these services and, thus, does not bill the payor directly. This "buy and bill" arrangement helps, among other things, to avoid the payor being double billed by both the physician and the HIT provider for the same services.

23. I am unaware of any HIT provider that operates in a manner other than Model #1 and Model #2, as described above.

b.  **Opinion #2: The BCBSWY – AIS Participating Provider Agreement does not incorporate the NHIA Guidelines.**

24. Throughout Mr. Dressel's report, he references the NHIA. The NHIA is a home infusion industry membership organization that provides advocacy, education, and resources to its members

5

(primarily home infusion therapy providers). NHIA is not an accrediting body. The NHIA membership creates the NHIA Guidelines, and those Guidelines are not binding on any provider or payor, including BCBSWY and Bond Pharmacy.

25. In my years of experience, I have never seen a contract between a Payor and a Provider that incorporates the NHIA Guidelines, and the BCBSWY – AIS Participating Provider Agreement is no exception. Not only does the Participating Provider Agreement not mention let alone incorporate the NHIA Guidelines, because the NHIA is not an accrediting body.

26. In my experience, if BCBSWY – Bond Pharmacy agreed to incorporate the NHIA Guidelines into their Participating Provider Agreement, they had to explicitly do so. I have reviewed the Participating Provider Agreement, and the Manual for In- Network Health Care Professionals and Hospitals. Neither of these documents even reference, much less incorporate, the NHIA Guidelines into the parties' contractual relationship. Therefore, it is my expert opinion that the terms of the Participating Provider Agreement, which does not include the terms of the NHIA Guidelines, govern AIS's claims.

27. In reviewing the expert report of Mr. Dressel, he notes that at least as relevant to the "HCPCS Code S9328 and their descriptors are approved and maintained by an alphanumeric editorial panel consisting of the Centers for Medicare and Medicaid Services (CMS), America's Health Insurance Plans and Blue Cross and Blue Shield Association." To my knowledge this editorial panel does not include the NHIA or its members. Therefore, the fact that the Participating Provider Agreement is silent on HCPCS codes, means that BCBSWY and AIS could not have adopted or incorporated the NHIA Guidelines into the Participating Provider Agreement.

28. Further, it is my opinion that even if the parties did adopt/incorporate the NHIA Guidelines into the Participating Provider Agreement, those Guidelines acknowledge and agree that the parties may, themselves, condition reimbursement of HIT services on the place of service and that this will depend on the terms of agreement between the payor and the HIT provider. I have also reviewed the NHIA Guidelines which note that its standards for per diems do not apply to traditional Medicare plans.

   c. **Opinion #3: The Participating Provider Agreement and the Manual for In-Network Health Care Professional and Hospitals governs the relationship between BCBSWY and AIS and AIS's claims.**

The documents govern the parties' relationship.

29. In my experience, when a HIT provider (AIS) and a payor (BCBSWY) enter a payor-provider relationship they will execute a contract, typically called a "provider agreement" or "ancillary provider agreement" or "participating provider agreement." This participating provider

6

agreement along with attachments and contractual binding materials then governs the terms of the relationship. Among other things, in these documents the parties will typically agree on the services for which the payor will reimburse the provider, the conditions under which the provider must provide its services and submit its claims, the rate or fee schedule the payor will pay the provider for the services, and any exclusions of service for which the payor does not agree to pay the provider.

30. In my experience, and as noted above, in evaluating home infusion claims, these documents will govern those claims, and thus these are the primary documents I would use to adjudicate those claims. I would use these documents to verify, among other things, that the payor (BCBSWY) agreed to pay the submitted claims, that the HIT provider (AIS) was permitted to provide the services associated with the claims and/or actually rendered those services, and that the HIT provider complied with all requirements for submitting the claims including the rate set forth in these documents and any other conditions.

31. In this case, the relevant contract is the participating provider agreement between BCBSWY and Bond Pharmacy, Inc. doing business as Advanced Infusion Solutions, effective as of May 24, 2019, (the "Agreement") and a Manual for In-Network Health Care Professionals and Hospitals, Revised June 27, 2022, (the "Manual").  Page 3 of the Manual specifically states, "that the content of this manual are contractually binding for compliance based on the Provider agreement with BCBSWY". Thus, to evaluate the claims AIS submitted for dates of service, I would rely on the documents.

## The BCBSWY – AIS Participating Provider Agreement contains an exclusion in the definition of a Claim.

32. Based on my experience, the Agreement contains an exclusion for payments when a claim is not complete and/or accurate. The Agreement states that a Claims is "a complete and accurate request for payment submitted by a Provider for Covered Services that have been provided by the Provider to a Participant in accordance with the terms of the Participants Benefits Document and this Agreement."

## The BCBSWY Manual for In-Network Health Care Professionals and Hospitals contains exclusions within the Participating Provider Responsibilities.

33.  Based on my experience, the Manual contains an exclusion for claims when the Provider does not comply with the specific participating provider responsibilities. The Manual states that "specific obligations of each Participating Provider are stated in the Provider Agreement and its

---

31 See: participating provider agreement and Manual for In-Network Health Care Professionals and Hospitals
32 See: participating provider agreement page 1.
33 See Manual for In-Network Health Care Professionals and Hospitals

7

attachments and addendums. Participating Providers are obligated to the general responsibilities as outline. Participating Providers are primarily and solely responsible for exercising professional judgement on all matters of professional practice with regard to a Member including, but not limited to, the selection, course, amount, and duration of the medical care for the Member. Several of these obligations state; "Cooperate with BCBSWY regarding communication and resolution of appeals and grievances." "Comply with the BCBSWY policies and procedures." The Manual also addresses "Certain events may result in the reduction, suspension, or termination of network participation privileges." The Manual also contains an additional exclusion. This additional exclusion when the "Provider's knowing or deliberate submission of false or misleading Claim information to BCBSWY"; or "Provider takes any action or makes any communication which fundamentally undermines the confidence of Members, potential Members their employers, unions, physicians, Providers or to the public in BCNSWY or in the quality of care provided to Members."

### AIS's expert opinions are not based on the Participating Provider Agreement.

34. I have reviewed the report submitted by Peter L. Dressel in this matter. Mr. Dressel ignores the duties and responsibilities and exclusions outlined in the Participating Provider Agreement, and Manual for In-Network Health Care Professionals and Hospitals.

35. Mr. Dressel makes reference to or provides an opinion as to whether AIS billing practices comply with the Participating Provider Agreement and Manual for In-Network Health Care Professionals and Hospitals. Mr. Dressel's report makes no reference to, and he provides no opinion concerning, nor does he even acknowledge the exclusion language that exists in the Participating Provider Agreement and Manual for In-Network Health Care Professionals and Hospitals (also discussed above). Additionally, Mr. Dressel makes no mention of any other contractual conditions related to the Participating Provider Agreement that would affect his evaluation or opinion of the claims in general or those claims he reviewed.

36. Mr. Dressel concludes that AIS's billing practice was consistent with NHIA Guidelines. I offer no opinion on whether AIS's billing practice was consistent with NHIA Guidelines because the NHIA Guidelines do not govern the billing practices in this case (*see* Opinion #2). The Participating Provider Agreement and Manual for In-Network Health Care Professionals and Hospitals govern the billing practices.

---

33 See: Manual for In-Network Health Care Professionals and Hospitals.

37. BCBSWY makes no mention of and gives no consent to follow NHIA Guidelines. In my 25 years of experience, I have negotiated over 200 agreements, many of which were participating provider agreements. I have never negotiated or executed an agreement that incorporated the NHIA Guidelines. If the parties to a participating provider agreement wanted to incorporate the NHIA Guidelines, I would expect them to state as much in the Participating Provider Agreement. The BCBSWY-AIS Participating Provider Agreement does not contain any references to the NHIA Guidelines, much less an express incorporation of them.

38. Mr. Dressel's report references a sampling of 302 claim lines and states that these claims were appropriately payable. However, Mr. Dressel makes no mention of the exclusions and conditions set forth in the Participating Provider Agreement and the Manual for In-Network Health Care Professionals and Hospitals (discussed above).

      **d.  Opinion #4: The Participating Provider Agreement between BCBSWY and Bond Pharmacy, Inc. doing business as Advanced Infusion Solutions, effective as of May 24, 2019, is consistent with home infusion agreements.**

39. As I stated previously, I have negotiated over 200 agreements, many of which were participating provider agreements and based on my experience the Agreement dated May 24, 2019, is consistent with home infusion agreements that I've negotiated.  Home infusion involves the intravenous administration of drugs to an individual at home (POS 12) place of service home. It is more convenient for patients than the patients having to travel to a physician's office or skilled facility for infusions. The home setting or place of service home can include the participant's / member's dwelling, such as a house, apartment, or other private living space A relative's home if the member lives there. A place of residence used as a home or place of dwelling and a home for the aged but does not include skilled nursing facility. The reimbursable components of the home infusion contract or in this case referred to as the Participating Provider Agreement are drug(s), per diem and nursing services.  These components are reimbursed to the Provider through the Healthcare Common Procedure Coding System (HCPCS codes). Claims must be billed with the (POS 12) place of service home.

40. This case specifically calls in question the review by BCBSWY of Bond Pharmacy's submitted claims for the period from January 1, 2019, through April 8, 2022, and was only a review of the in-home intrathecal pump service provided by AIS, a review of claims for the HCPCS per diem code S9328. The review by BCBSWY as stated in a letter dated Apil 26, 2022 between BCBSWY General Counsel, Raymond J. Redd, and Bond Pharmacy references "incorrect payments". Mr. Dessel concludes that based on his review of 302 sample claims lines, he has confirmed that AIS provided drugs and services pursuant to BCBSWY guidance. However, based on my years of

experience, there are other ways in which the parties can determine if services were met. As stated previously, the Clinical Pharmacist, assigned to the patient(s) related to the claim(s) in question, should be charting clinical notes pursuant to the Plan of Care as well as contacting the patients prior to dispensing and communicating scheduled deliveries. The nurse assigned to the patient should also be charting nursing notes while in the patient's home, observing and documenting any significant medical information. A delivery log indicating the date, time, and address for the delivery as well as a signature of the patient or caregiving acknowledging the delivery.

41. The first steps in home infusion require a patient onboarding process. This onboarding process involves a team of home infusion experts and professionals working simultaneously to determine patient eligibility, insurance coverage verification with the payor, design the therapy and monitoring plan, compound/prepare the medications and supplies, establish treatments goals, and coordinate the home nursing service. The home infusion pharmacist performs a wide range of onboarding tasks including consulting with the patient, physician and nurse as needed.  The Pharmacist may make, discuss and/or suggest changes to the prescribed treatment and monitor the plan of care. To initiate home infusion service, it is mandatory that a home infusion provider have the patient execute admission paperwork and documentation prior to service.  At the same time, the patient will also execute a financial agreement and documentation which allow the provider to bill the patient's payor.   It is customary for the home infusion pharmacist to provide patient counseling, and it is common practice for a home infusion pharmacist to contact all patients regardless of the payor prior to dispensing drug to a patient at home.  The plan of care is designed to facilitate communication among members of the care team and with the patient. The patient is encouraged to take an active role in their care. This allows the patient to be involved in their healthcare and treatment decisions, and in managing their health and well-being, improving health outcomes and patient satisfaction.  This insures that the patient knows has knowledge of and understand the members of their care plan team, the plan and course to achieve their healthcare goals.

I hereby certify that this report is a summary of my work to date. I reserve the right to supplement and/or amend this report.

Joseph A. Malatesta

Dated: August 15, 2024

---

40 See: Letter between BCBSWY and Bond Pharmacy dated April 26, 2022

# Attachment A

## Materials Considered

Expert Report:

- Expert Report of Peter L. Dressel Dated July 12, 2024

Pleadings & Filings:

- AIS Complaint
- BCBSWY Answer & Counterclaim
- Plaintiffs Rule 26
- Plaintiff Responses and Objections to Defendant's First Set of Interrogatories
- Letter From Sheppard Mullin to BCBSWY Attn: Raymond J. Redd

Produced Documents:

- Participating Provider Agreement
- BCBSWY Manual for In-Network Health Care Professional and Hospital Revised 6/27/2022.
- Attachment "A" Home Infusion, Home Infusion Pricing
- Settlement Statement
- Incorrect Payments letter Dated; April 26, 2022
- Email from Penelope Butterfield to Beverly Aborne Dated April 5, 2022, 5:28 PM
- Email from Beverly Aborne to Penelope Butterfield Dated April 6, 2022, 8:20 AM
- Email from Penelope Butterfield to Beverly Aborne Dated April 6, 2022, 9:24 AM
- Email from Beverly Aborne to Penelope Butterfield Dated April 6, 2022, 4:53 PM
- Email from Penelope Butterfield to Beverly Aborne Dated April 7, 2022, 11:31AM
- Email from Beverly Aborne to Penelope Butterfield Dated April 7, 2022, 2:18 PM
- Letter from Beverly Aborne to Penelope Butterfield Undated Re: AIS Billing Practices

Other Documents:

- BCBSWY Manual for In-Network Health Care Professional and Hospital Revised 2/1/2024.
- Blue Cross Blue Shield of Wyoming Home Infusion Reimbursement and Billing Guideline April 2007
- https://nhia.org/about-nhia/
- https://www.cms.gov/medicare/regulations-guidance/physician-self-referral/list-cpt-hcpcs-code

10

# Attachment B

## EXPERT JOSEPH A. MALATESTA

I am Joseph A. Malatesta.  I am a consultant specializing in providing guidance to home and ambulatory infusion providers. I have over 25 years of expertise in acquisitions, sales/liaison management, managed care contracting, sub-contract nursing relationships, market trends and analysis, new business development and therapy focus. I am a consultant for private equity and investment firms, as well as national, regional and single site home infusion providers. Prior to consulting, I worked for several regional home infusion providers with responsibilities for all sales and business development functions, including determining strategic sales direction. I conducted market research to establish future direction, vision, strategies, and tactics.  I have experience in exploring new markets, identifying customers and accelerating business growth. I developed and co-built programs to showcase service offerings, drive referral/hospital partnership opportunities, and cultivate and mature relationships all in the effort to support accelerated growth initiatives. My responsibilities also included all contracting which involved negotiating over 200+ insurance/managed care contracts, nursing and partnership agreements.

## Work Experience

My resume is attached as Attachment C.

- January 2021 – Present

  **Consultant**
  Main clients: private equity firms, home infusion providers and consulting firms

- May 2017 - December 2020

  **ContinuumRx- Chief Sales Officer**
  A member of the executive team providing strategic direction

- June 2014 – May 2017

  **Consultant-self-employed**
  Main clients: private equity firms, home infusion providers and consulting firms

- 1999- 2014

  **Home Solutions**
  (By acquisition BioScrip/by acquisition Optioncare)
  Progressive responsibilities from direct sales to senior sales executive and member of the executive management. Focus: sales, contracting and growth strategy.

## Testimony History

I have given testimony and was deposed as an expert witness in a former industry prior to 2019. I have given testimony in employment agreement disputes in the home infusion industry prior to 2019.

*Bond Pharmacy d/b/a Advanced Infusion Solutions, Plaintiff, v. Anthem Health Plans of Virginia, d/b/a Anthem Blue Cross and Blue Shield, Defendant* – United States District court for the Easter District of Virginia (Alexandria Division) – Case No. I:22-cv-01343-CMH-IDD. Provided testimony

11

on behalf of the Defendant Anthem Blue Cross and Blue Shield regarding the Preferred Provider Agreement and Addendum.

*Bond Pharmacy d/b/a Advanced Infusion Solutions, Claimant, v. Anthem Insurance Companies, Inc. Respondent,* JAMS Arbitration – Reference No 5410000286

## Publications and Presentations

I have not written any published articles in reference to home infusion therapy.  However, I wrote, and I am named as author in 26 marketing materials on the ContinuumRX website, some of these materials are after my tenure with the Company.

## Compensation

I am receiving compensation for my work on an hourly rate structure.  My compensation is not affected by the outcome in this case.

## Assignment

I have been retained by the Law Firm of Hathaway & Kunz, LLP principally to review and evaluate the dispute between Bond Pharmacy, Inc., d/b/a AIS Healthcare. I also been asked to review the Participating Provider Agreement with an effective date of May 24, 2019, entered into and by Blue Cross Blue Sheild of Wyoming (BSBCWY) and Bond Pharmacy d/b/a Advanced Infusion Solutions, (Provider). I was also asked to provide an opinion based on my years of experience as to whether said Participating Provider Agreement is consistent with the home infusion agreements I've experienced and if this Participating Provider Agreement provides for intrathecal reservoir pump refills in place of service home (POS 12) or physician's office.

# Attachment C

---

## JOSEPH A. MALATESTA

2700 Atlantic Avenue, Unit 406, Longport, New Jersey 08403
Cell: 609-892-2953 • Email: Josephmalatesta15@gmail.com

---

### CHIEF SALES OFFICER / STRATEGIC ACQUISITIONS
### NEW BUSINESS DEVELOPMENT / LEADERSHIP

---

### PROFESSIONAL SUMMARY

Seasoned Senior Executive known for consistently exceeding sales and profit expectations; building exceptional teams; and leading innovation and change to propel growth in the home/specialty pharmacy health care market. Most recently, focused on identifying strategic growth and investment opportunities and executing acquisition transactions for Private Equity and strategic home infusion/specialty providers.

*Core Competencies Include:*

*Strategic Planning & Management • Acquisitions & Strategic Partnerships • Market Penetration •Brand and Identity Development • DeNovo Market Analysis • New Business Growth •Team Building • Coaching for Improved Performance • Retention and Incentive Strategy • Managed Care and Partnership Contracting*

---

### PROFESSIONAL EXPERIENCE

**Consultant**
**January 2021 – Present**
Consultant for private equity, investment firms and national, regional and single site infusion providers, to provide guidance on acquisitions, sales/liaison management, managed care contracting, sub-contract nursing relationships, market trends and analysis, new business development and therapy focus.

**Chief Sales Officer**
**ContinuumRx Specialty Infusion Services**
**May 2017 - December 2020**
Recruited by a private equity firm to provide structured leadership and strategic direction to develop to build and motivate a top-level sales team. As a member of the executive team, responsible for organic sales growth, denovo expansion, acquisitions, contracting and long-range strategic market analysis. Responsible for all partnership relations. Chairman of the Board for all Joint Venture relationships.

**Consultant**
**June 2014 – May 2017**
Represent several clients, both private equity and strategic infusion providers, to identify, evaluate, and provide due diligence for potential home infusion acquisitions across the United States.  Working contact list of over 85 potential targets.

Recruited by a private equity firm to provide structured leadership and strategic direction to develop a home infusion platform in the Midwest.  Worked with the management teams of the acquisition candidates, conducted the business and operational due diligence in the acquisition process.

**Home Solutions** *Infusion Therapy*
**1999 – 2014**
Advanced rapidly with progressive responsibilities to senior sales executive and member of the executive management team with ultimate title of Executive Vice President of Strategic Programs and Partnerships.  Identified, evaluated and managed new acquisitions and business opportunities to ensure sustained profitable growth. Oversaw activities upon acquisition. Actively managed a pipeline of 12 - 15 potential acquisition targets.

As Chief Sales Officer, responsible for all sales and business development functions, including determining the company's strategic sales direction.  Conducted market research to establish future direction, vision, strategies, and tactics.  Hands-on experience in exploring new markets, identifying customers and accelerating business growth. Developed and co-built programs to showcase service offerings, drive referral/hospital partnership opportunities, and cultivate and mature relationships all in the effort to support accelerated growth initiatives. Responsible for all contracting: 200+ insurance/managed care contracts, nursing and partnership relations.

As Executive Vice President of Sales, Marketing, and Branding, provided sales leadership to a team of 60+ Regional Sales Managers, Account Managers, Clinical Liaisons, and Clinical Sales Specialists to grow and defend a $105M revenue in home infusion sales with 12 locations servicing 16 states in the Northeast/Mid-Atlantic regions.  Expertise in building and motivating top-level teams to consistently meet and exceed business goals and objectives. Consistently achieved double digit growth year over year.

## EDUCATION

Pennsylvania State University
Bachelor of Business Administration –

13